UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| OLIVER GARCIA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL NO. M-08-264 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Oliver Garcia filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security Administration's denial of Plaintiff's application for disability benefits.[1]  Plaintiff's application alleged that he became disabled at age 50 due mainly to pain and swelling in his right leg.  He claims in this action that the Administrative Law Judge (ALJ) who denied his application erred in two ways: 1) failing to find at step two of the disability analysis that chronic venous insufficiency of the right lower extremity constitutes a severe impairment; and 2) failing to explain at step three his determination that Plaintiff's chronic venous insufficiency of a lower extremity does not meet or equal Listing 4.11A.  (Docket No. 9, at 2.)  Pending before the Court are the parties' cross-motions for summary judgment.  (Docket Nos. 9, 10.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's.  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

---

[1] With the consent of the parties, the District Court referred this case to the undersigned for plenary handling pursuant to 28 U.S.C. § 636(c)(1).  (Docket No. 13.)

After carefully considering the record in light of the deferential standard of review that applies, the Court finds that Plaintiff's claims lack merit. As explained further below, to the extent that the ALJ erred at either step two or step three of the disability analysis, any such errors were harmless. The ALJ proceeded past step two of the disability analysis and considered all of Plaintiff's symptoms and impairments in finding him not disabled at step five. As to the alleged error at step three, Plaintiff failed to establish that he met the criteria of Listing 4.11A. Accordingly, for the reasons explained further below, the Court will grant the Commissioner's motion for summary judgment.

## I. BACKGROUND[2]

On October 31, 2005, Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively. (*See* Tr. 15, 36.) In both applications, Plaintiff alleged that he became disabled on September 13, 2005, and he identified "[p]roblems with legs, pins in legs, [and] hip problems" as the conditions that prevented him from working. (*See* Tr. 15, 106-07, 112.)

Plaintiff's applications were denied initially and on reconsideration. (Tr. 27, 28.) Plaintiff then requested a hearing before an ALJ, which was held on August 17, 2007, in Harlingen, Texas. (Tr. 35, 39, 325-63.) After the hearing, the ALJ issued a written decision finding that Plaintiff was not disabled because he retained the residual functional capacity to perform restricted light work. (Tr. 9–24.)

---

[2] The Commissioner has filed a transcript of the record of the administrative proceedings, which will be cited as "Tr."

In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[3]

## A.    Education and Work Experience

Plaintiff attended high school through the 11th grade, obtained a GED degree, and completed some college.  (Tr. 110, 328-29.)  Plaintiff was 50 years old on the date that he alleges he became disabled, September 13, 2005.  (*See* Tr. 112.)  For the fifteen years prior to filing his disability applications, Plaintiff held numerous jobs, including the following: security officer, driver, machine operator, collections agent, and convenience store clerk.  (Tr. 22-23, 88, 96.)  Plaintiff worked as a security officer from 1977 to 1993; his duties included guarding businesses and homes and driving an armored truck.  (Tr. 88-90, 96, 99-100.)  In 1999 and 2000, Plaintiff worked for approximately one year as a driver for an adult day care.  (Tr. 88, 92.)

In addition, Plaintiff worked as a machine operator from 2000 to 2002, which involved standing for eight hours a day, packing boxes, and cleaning his area.  (Tr. 88, 93, 96.)  Plaintiff also worked briefly as a cashier or store clerk in 2001 and from 1997 to 1999.  (Tr. 88.)  At these jobs, Plaintiff also stood for eight hours a day, performing duties such as operating the register, cleaning the store, and carrying boxes of merchandise.  (Tr. 91.)  Most recently, Plaintiff worked as a collections agent from 2001 to 2005.  (Tr. 88, 96.)  This was a desk job that involved handling phone calls and managing accounts on a computer.  (Tr. 94.)  Plaintiff claims that he was fired from this job because he was unable to sit continuously, and he has not worked since.  (Tr. 337-38.)

---

[3]  The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**B.      The Medical Evidence**

Plaintiff's initial application listed his conditions limiting his ability to work as follows: "[p]roblems with legs, pins in legs, [and] hip problems."  (*See* Tr. 15, 106-07, 112.)  Although Plaintiff subsequently noted other impairments, the medical evidence in the record principally addresses the problems with his legs.  Plaintiff's claims in this case allege that the ALJ erred with respect to findings relating to his leg impairments.

1.      Leg Pain and Swelling

On November 29, 2005, Plaintiff was seen by Dr. Moeena Zain at the Mcallen Diagnostic Clinic; Dr. Zain performed a physical exam and ordered various X-rays.  (Tr. 313-15.)  Plaintiff stated that he had been experiencing "bilateral leg pain since 1991" due to a motorcycle accident.  (Tr. 313.)  In the accident, Plaintiff sustained a fractured right hip and right femur, for which "he was given an open reduction and internal fixation of the right femur."  (*Id.*)  Plaintiff also had his third left toe amputated as a result of the accident.  (*Id.*)

Plaintiff also stated that since the accident in 1991, he has developed pain in both legs, but mainly he experiences pain in his right hip that radiates down into his right leg.  (*Id.*)  Plaintiff also complained of bilateral leg swelling, which is more pronounced in his right leg.  (*Id.*)  Plaintiff believes that he is unable to stand for more than a couple of hours, and he does not walk.  (*Id.*)  However, Plaintiff does not have any numbness, and he reported taking only Tylenol and occasionally Darvocet[4] to manage his pain.  (*Id.*)

---

[4] Darvocet is prescribed to treat "mild to moderate pain."  Nursing 2008 Drug Handbook 1328 (28th ed. 2008).

4

Based on her examination, Dr. Zain noted that Plaintiff was "significantly overweight," yet he was able to get up from a chair to an examination couch with only "slight difficulty." (Tr. 314.) In addition, Dr. Zain observed that Plaintiff was able to move around "in general" and his gait appeared "normal." (*Id.*) An exam of his legs revealed "2+ edema[5] and chronic skin changes secondary to chronic edema," with "brownish pigmentation of chronic edema in both lower legs." (*Id.*) Plaintiff showed "good range of motion" in his knees, with 140 degree flexion and 0 degree extension on both sides. (*Id.*) His lower extremity power was "4/5." (*Id.*)

X-rays were taken of Plaintiff's right knee and right tibia and fibula. (Tr. 315.) The images of his right knee showed "no fracture or dislocation," well preserved joint spaces, and "[n]o definite osseous pathology." (*Id.*) Likewise, the images of his right lower leg showed "no fracture or dislocation"; however, there were "[a]rthritic changes of the right ankle with talar spurring noted." (*Id.*)

Dr. Zain's overall diagnostic impression was that Plaintiff's "primary injury is significantly made worse by his obesity," and that he "appears to be significantly disabled at this time." (Tr. 314.) Dr. Zain noted that Plaintiff was "unable to carry out his activities of daily living," but she also noted that "he would be a lot more functional" if he lost weight. (*Id.*)

On December 27, 2005, Plaintiff was involved in a motor vehicle collision where his car was "T-boned by another driver." (Tr. 164.) As a result, he went to the Rio Grande Regional Hospital emergency room, complaining of pain to the left side of his

---

[5] Edema is "[a]n accumulation of an excessive amount of watery fluid in cells or intercellular tissues." STEDMAN'S MEDICAL DICTIONARY 566-67 (27th ed. 2000).

body, including his neck, arm, and leg.  (Tr. 163-64, 169.)  Plaintiff's previous surgery to his right hip was noted, but after the car accident, he still maintained a full range-of-motion of his left arm and leg.  (Tr. 164-65.)  The emergency room physician noted that Plaintiff was obese.  (Tr. 165, 169.)  Plaintiff was discharged the same day, with the doctor prescribing rest, ice, and over-the-counter pain medications.  (Tr. 163.)

The next month, on January 19, 2006, Plaintiff returned to Rio Grande Regional Hospital emergency room, complaining of shortness-of-breath and constant sharp pain and tightness in his chest.  (Tr. 171.)  The examination notes reflect that Plaintiff had "lower extremity edema" (Tr. 183), with dark skin discoloration distally in both legs and "edema pretibial 2+" symmetrically in both legs (Tr. 178, 184).  Plaintiff received a "venous color Doppler ultrasonography of bilateral lower extremities."[6]  (Tr. 190.)  The doctor's impressions form this exam included "right lower extremity with evidence of chronic deep venous thrombosis with collateralization" and "no evidence of deep venous thrombosis" in the left leg.[7]  (*Id.*)

Dr. Vicente Gonzalez examined Plaintiff and admitted him to telemetry (heart monitoring).  (Tr. 179.)  Dr. Gonzalez noted that the Doppler test showed that Plaintiff had "right femoral DVT" (deep vein thrombosis), with a thrombus (clot) "fixed to the vessel wall."[8]  (*Id.*)  Dr. Stanley Sy also saw Plaintiff during this visit, and he noted

---

[6] A Doppler study involves a "diagnostic instrument that emits an ultrasonic beam into the body."  STEDMAN'S MEDICAL DICTIONARY 537 (27th ed. 2000).

[7] Thrombosis is the "[f]ormation or presence of a thrombus; clotting within a blood vessel which may cause infarction of tissues supplied by vessel."  STEDMAN'S MEDICAL DICTIONARY 1831 (27th ed. 2000).

[8] Thrombus is a "clot in the cardiovascular systems formed during life from constituents of blood."  STEDMAN'S MEDICAL DICTIONARY 1832 (27th ed. 2000).

Plaintiff's "deep venous thrombosis" in the right leg.  (Tr. 180.)  Dr. Sy observed that Plaintiff's deep venous thrombosis was "maintained only on aspirin." (*Id.*)  Plaintiff was discharged on January 23, 2006.  Dr. Gonzalez's discharge report noted that Plaintiff's heart condition had "improved" and that his chronic DVT was "stable."  (Tr. 177.)

On May 23, 2006, Plaintiff's right hip was X-rayed.  (Tr. 127.)  The results of the X-ray revealed "[a]n old fracture deformity of the proximal shaft . . . involving the intertrochanteric region," "no evidence of an acute fracture," well-maintained hip joint space, and surgical screws that were transfixing the proximal femur.  (*Id.*)  The final impression was that there were "post-surgical and chronic changes."  (*Id.*)

On January 19, 2006, a state agency medical consultant, Dr. Jeanine Kwun, reviewed Plaintiff's medical records and performed a residual functional capacity (RFC) assessment.  (Tr. 304-11.)  Dr. Kwun determined that Plaintiff had the ability to do the following: lift and/or carry 25 pounds frequently and 50 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk less than 2 hours out of an 8-hour workday; and was not limited in his ability to push and/or pull (including operating foot controls).  (Tr. 305.)   In addition, the doctor determined that Plaintiff could only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders. (Tr. 306.)  Plaintiff was assessed to have no other limitations.  (Tr. 307-08.)  Dr. Kwun concluded that Plaintiff's alleged subjective limitations were not fully supported by objective medical evidence.  (Tr. 311.)

Seven months later, on July 25, 2006, another state agency physician, Dr. Frederick Cremona, reviewed Plaintiff's medical records and performed a RFC assessment.  (Tr. 115-22.)  Dr. Cremona determined that Plaintiff had the ability to do the

following: lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk at least 2 hours out of an 8-hour workday; and was not limited in his ability to push and/or pull (including operating foot controls). (Tr. 116.)  In addition, Dr. Cremona determined that Plaintiff could only occasionally climb stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders.  (Tr. 117.)  Plaintiff was assessed to have no other limitations.  (Tr. 118-19.)  Dr. Cremona concluded that Plaintiff's alleged subjective limitations were not supported by objective medical evidence.  (Tr. 120.)

2.      Other Medical Impairments

In his decision, the ALJ determined that Plaintiff had severe impairments that included the following: "congestive heart failure, diabetes mellitus, and obesity."  (Tr. 17.)  During the evidentiary hearing, Plaintiff also complained of blurry vision.  (Tr. 345-46.)  Accordingly, medical records relevant to those impairments will also be summarized.[9]

To begin with, virtually every physician that has seen Plaintiff has noted his morbid obesity.  (*See* Tr. 169, 178, 180, 183, 311, 314.)  Dr. Zain noted that Plaintiff's ability to carry out his activities of daily living would be improved should he lose weight.  (Tr. 314.)  Notwithstanding his obesity, Plaintiff was still able to "move around" with a normal gait.  (*Id.*)

During Plaintiff's hospital visit in January 2006, he reported that he had been experiencing the shortness-of-breath for the past several months, which had worsened

---

[9] This is perhaps unnecessary since Plaintiff only challenges the ALJ's decision as it pertains to his leg impairments.

8

over the last several days.  (Tr. 178.)  Dr. Gonzalez noted that Plaintiff was morbidly obese,[10] with several medical conditions, including decompensated congestive heart failure, hyperglycemia, diabetes mellitus,[11] and sleep apnea.  (Tr. 178, 184.)  Plaintiff was "not taking any regular medications."  (Tr. 178.)

After being admitted to the telemetry unit, Plaintiff underwent an echocardiography.  This testing revealed "normal" heart valves, atriums, and ventricles, with an overall impression of "poor windows."  (Tr. 182.)  In addition, a "portable chest" exam was generally "unremarkable," showing clear lung fields and normal heart size. (Tr. 199.)  While at the facility, Plaintiff's glucose level was decreased from 514 to 291, and he was placed on various medications.[12]  (Tr. 176-77.)  Plaintiff was discharged on January 23, 2006, and instructed to follow-up with his primary-care physician.  (Tr. 177.)

Plaintiff followed-up the next day at Nuestra Clinica Del Valle, complaining mainly of pain to the middle of his back.  (Tr. 206.)  Plaintiff was referred for numerous lab tests.  After undergoing those tests, he returned to the clinic on January 30, 2006, for his results.  (Tr. 205.)  Most notably, his "occult blood" test results were "negative" but his glucose level was high at 274.  (Tr. 207-08.)

---

[10] Plaintiff stated that in the past few years, his clothing size had increased from a 46 to a 54.  (Tr. 180.)

[11] In fact, this was the first time that Plaintiff had been diagnosed with diabetes mellitus, and his glucose level on admission was 514.  (Tr. 178, 180.)

[12] The medications included Levaquin, Atrovent, insulin, Lasix, Lovenox, and Proventil.  (Tr. 176-77.)  Levaquin is prescribed to treat "mild to moderate skin and skin structure infections caused by" Staph infections.  NURSING 2008 DRUG HANDBOOK 142 (28th ed. 2008).  Atrovent is prescribed to treat chronic bronchitis and emphysema.  *Id.* at 642.  Lasix is prescribed to treat "acute pulmonary edema" and hypertension.  *Id.* at 866. Lovenox is prescribed to "prevent pulmonary embolism and deep vein thrombosis."  *Id.* at 907.  Proventil is prescribed to "prevent or treat bronchospasm in patients with reversible obstructive airway disease."  *Id.* at 633.

On February 2, 2006, Plaintiff had his vision checked at Eyear Optical.  (Tr. 159, 282-84.)  Plaintiff's vision was assessed to be 20/50 and 20/60, uncorrected.  (Tr. 120, 159.)  Plaintiff received a new prescription for eyeglasses and was also informed of the importance of maintaining his blood sugar level.  (Tr. 159, 282.)

On May 24, 2006, Plaintiff was seen at McAllen Medical Center, where he was diagnosed with and treated for bronchitis.  (Tr. 142, 146-49.)  This was the last significant medical treatment reflected in the record.

## C.    The Evidentiary Hearing

An evidentiary hearing was held on August 17, 2007, in Harlingen, Texas.  (Tr. 325–63.)  Two witnesses testified: Plaintiff, represented by an attorney, and Patricia Collins, a vocational expert.  (Tr. 326.)

Plaintiff testified about his past work experience.  Plaintiff stated that during his work as a security officer, he was standing and walking during his entire 8-hour shift.  (Tr. 329.)  Plaintiff regularly lifted 50-pound bags of coins during this job.  (Tr. 329-30.)  During his work as a convenience store cashier, he re-stocked and cleaned the store in addition to working the register.  (Tr. 330.)  Plaintiff lifted up to 20 pounds during this job and was on his feet eight hours a day.  (*Id.*)  As a driver for an adult day care, Plaintiff transported clients and was again often on his feet.  (Tr. 330-31.)  Because Plaintiff had to lift clients and help them with their activities, he lifted 100 pounds or more during this employment.  (Tr. 331-32.)

Plaintiff had also worked as a machine operator, where he was likewise on his feet all day and frequently lifted boxes that weighed around 20 pounds.  (Tr. 332.)  In his most recent employment as a collections agent, Plaintiff stated that he sat in front of a

computer most of the time.  (Tr. 332-33.)  Plaintiff did not do any lifting at this job.  (Tr. 333.)  Although being a collections agent was his easiest job, Plaintiff feels that he could not return to this work because he is unable to sit for extended periods of time and his employer would not allow him to stand up at his desk.  (Tr. 333-34.)  Plaintiff explained that he is unable to sit for too long because he experiences swelling in his legs, which he can alleviate only by elevating his feet.  (Tr. 334.)

In explaining why he believes he cannot work, Plaintiff stated that his legs swell and that he has "constant" pain in his hip and lower right leg.  (Tr. 335.)  Plaintiff then stated that he has been experiencing swelling in his legs since his motorcycle accident in 1991, but that it worsened in 2005.  (Tr. 337.)  Plaintiff experiences the leg swelling when he sits or stands for too long.  (Tr. 338.)  To help reduce the swelling, Plaintiff elevates his legs, lies down, and takes medication.  (*Id.*)  Plaintiff described the current condition of his legs as "kind of swollen," with "a scaly kind of skin" that has a "brownish" discoloration.  (Tr. 340.)  When the skin is pressed, "it doesn't come back up."  (*Id.*)

Plaintiff stated that he experiences "sharp, stinging pain" in his right hip "very often."  (Tr. 343.)  The pain is present whether he is sitting or standing, so he attempts to minimize it by "[l]ying down, lifting, lifting my leg, [or] elevating it."  (Tr. 344.)  Plaintiff had a surgery on his hip after his 1991 accident, but he was unsure what was specifically causing the pain.  (*Id.*)

As a result of the 1991 accident, Plaintiff has also experienced pain and swelling in his right ankle.  (Tr. 346.)  He has been told that he has arthritis and a spur in his right ankle.  (*Id.*)  Even though not prescribed, Plaintiff began using a cane six months prior to

the hearing.  (Tr. 347.)  Plaintiff stated that the cane "helps [him] to maintain the pain a little bit."  (*Id.*)  Plaintiff must walk slow because he loses his breath; however, he does not need the cane at home because there are other things around him to hold on to.  (Tr. 348.)  Plaintiff has never lost his balance and fallen.  (*Id.*)

Plaintiff also mentioned his diabetes and excessive weight ("close to 400 pounds").  (Tr. 335.)  Plaintiff stated that he has struggled with his weight since being in his motorcycle accident in 1991.  (*Id.*)  Plaintiff has tried diets and lowered his weight to 300 pounds in the past, but he has always regained the lost weight.  (Tr. 336.)  Although he is not supposed to let his blood sugar level get above 200, it goes above that when he does not "keep [his] diet."  (Tr. 345.)  Plaintiff follows his diet "to a certain point."  (*Id*.)  Plaintiff believes that his diabetes is causing blurry vision.  (Tr. 345-46.)

To address his ailments, Plaintiff takes several medications.  (Tr. 340.)  At the time of the hearing, he was taking Coumadin for the blood clot in his leg, Furosemide for the swelling, glucose for the diabetes, and a muscle relaxer.[13]  (Tr. 341, 344, 349.)  Plaintiff does not get any side effects from these medications.  (Tr. 349.)    Plaintiff also takes Advil or Tylenol to cope with the pain from cramps.  (Tr. 350.)

In describing his physical limitations, Plaintiff stated that he can walk 10-15 feet before he loses his breath.  (Tr. 347.)  He can only sit and stand for at most 30 minutes.  (Tr. 347-48.)  Plaintiff stated he is able to lift and carry 10 pounds, and he is able to push a shopping cart (although he usually uses a motorized cart when shopping).  (Tr. 348,

---

[13] Plaintiff is able to afford the medications by having a cousin send them from Mexico.  (Tr. 349.)

351.)  He is able to drive to nearby stores, the post office, or to visit his children.  (Tr. 351, 354-55.)

Plaintiff stated that his wife helps him bathe and put on his pants and shoes (because he "can't bend over").  (Tr. 352.)  Plaintiff is able to "pick up little things," mow the grass using a "weed eater," and go fishing and hunting when friends invite him. (Tr. 353.)  On these outings, Plaintiff takes breaks from fishing and hunting every 30 minutes to sit down and elevate his legs.  (Tr. 353-54.)

The vocational expert (VE), Ms. Collins, responded to several hypothetical questions posed by the ALJ.  (Tr. 355.)  The ALJ first asked her to assume that Plaintiff had the residual functional capacity (RFC) to lift 10 pounds frequently and 20 pounds occasionally, stand/walk for 2 hours, and sit for 6 hours (with normal breaks); in addition, the ALJ asked her to assume that Plaintiff would need to elevate his right leg for several hours a day.  (Tr. 356.)  Ms. Collins stated that with those limitations, Plaintiff could not perform any of his past work.  (*Id.*)  The ALJ then asked her to assume the same parameters, except that the pain in his leg from standing would require him to take additional morning and afternoon breaks.  (Tr. 356-57.)  Ms. Collins again stated that he would not be able to maintain employment with those limitations.  (Tr. 357.)  Likewise, she testified that he would be unable to perform any work if right leg pain and shortness of breath limited his ability to stand and sit to 30 minutes at a time and if he could not work at least six out of eight hours without elevating his leg.  (Tr. 357.)

Finally, the ALJ asked her to assume that Plaintiff could lift 10 pounds frequently, 20 pounds occasionally, stand and/or walk at least 2 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.  (Tr. 358.)  Ms. Collins stated that he would be unable to

perform his past relevant work; however, "[t]here would be jobs that could be done with that profile in the light range that allow sit/stand option." (*Id.*)  She described the following positions as examples of jobs she believed Plaintiff was capable of performing:

> 1) Products Assembler - representing approximately 2,000,000 jobs in the national economy and 18,000 in Texas;
>
> 2) Hand Packager – representing approximately 2,000,000 jobs in the national economy and 20,000 in Texas; and
>
> 3) Production Checker – representing 250,000 jobs in the national economy and 7,000 in Texas.[14] (*Id.*)

Counsel for Plaintiff cross-examined the VE regarding the ALJ's hypotheticals. (Tr. 359.)  Counsel asked the VE if Plaintiff would be able to perform the jobs she identified (based on the hypothetical with the sit/stand option) if he could not use both hands when standing due to the use of a cane.  (*Id.*)  Ms. Collins stated that he would not. (*Id.*)  Assuming the same hypothetical, counsel asked the VE if Plaintiff would be able to perform the jobs if he required additional, unscheduled breaks due to blurry vision.  (Tr. 359-60.)  Ms. Collins stated that he would not.  (Tr. 360.)  Finally, counsel asked the VE whether Plaintiff could maintain employment if he was limited to standing and/or walking less than 2 hours in an 8-hour day and could only sit for 6 hours.  (*Id.*)  Ms. Collins replied that Plaintiff could not maintain employment because he would need to be able to work a total of 8 hours in a day.  (*Id.*)

In closing arguments, counsel argued that the ALJ should give the most weight to the report by Dr. Zain, who opined that Plaintiff "appears to be significantly disabled at this time."  (Tr. 361.)  In addition, counsel argued that Plaintiff met "the requirements of

---

[14] The VE stated that she "reduced the numbers by about 50%" because Plaintiff required the sit/stand option.  (Tr. 358.)

listing at 4.11 for chronic insufficiency, venous insufficiency." (*Id.*)  Counsel further asserted that Plaintiff may also meet "the listings at 1.02, because he has the arthritis of a weight-bearing joint of the right ankle." (*Id.*)

**D.    The ALJ's Decision**

In making his decision, the ALJ relied on the testimony that was presented at the hearing and the medical evidence in the record.  (Tr. 15–24.)  The ALJ applied the five-step method for evaluating disability claims.[15]

The ALJ first found (at step one) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability.  (Tr. 17.)  In considering the severity of Plaintiff's impairments (step two), the ALJ determined that Plaintiff had the following "severe" medical impairments: degenerative joint disease of the right ankle, fracture deformity of the right femur, congestive heart failure, diabetes mellitus, and obesity.  (*Id.*)  The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in the regulations (step three).  (Tr. 19.)  The ALJ specifically discussed Listings 3.02, 1.02A, and 9.08.  (Tr. 19-20.)

In reaching these conclusions, the ALJ summarized the evidence in the record, including the following: the medical findings during treatment at Rio Grande Regional Hospital and Nuestra Clinica Del Valle; medical opinions given by Dr. Zain and the state agency physicians; the X-rays and other objective medical tests; and Plaintiff's own testimony.  (Tr. 17–20.)

---

[15] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section, *infra* Part II.A.

Next, the ALJ assessed Plaintiff's RFC to do work-related activities.  (Tr. 20.)  In addition to his review of the medical evidence, the ALJ analyzed Plaintiff's subjective symptoms in accordance with the regulations.  (*Id.*)  The ALJ noted that Plaintiff's primary problem seemed to be "[l]ack of compliance."  (Tr. 22.)  In addition, despite his excess weight, Plaintiff exhibited a normal gait, was able to rise easily from a seated position, and showed no evidence of sensory or motor deficits.  (*Id.*)  The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce some degree of symptomatology"; however, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (Tr. 21-22.)

The ALJ determined that Plaintiff had the ability to perform work at the restricted light exertional level, which includes: lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally; sit for 6 hours out of an 8-hour work day; and stand and/or walk 2 hours intermittently out of an 8-hour work day.  (Tr. 20-22.)  In reaching this conclusion, the ALJ relied on the examination and report by Dr. Zain.  (Tr. 22.)  The ALJ also took into account the assessments by the state agency physicians.  (*Id.*)

The ALJ then found (at step four) that Plaintiff was unable to perform his past relevant work as a convenience store clerk, collections agent, machine operator, driver, and security officer because these jobs require standing and walking for more than 2 hours total in a workday.  (Tr. 22-23.)  The ALJ next considered (at step five) whether there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, given his ability to perform restricted light work.  (Tr. 23.)  Based on the VE's testimony, the ALJ found that Plaintiff could perform jobs existing in

significant number in the national economy.  (*Id.*)   As such, the ALJ concluded that Plaintiff is "not disabled."  (*Id.*)

**E.      Procedural History**

Plaintiff sought administrative review of the ALJ's decision.  (Tr. 7-8.)   The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review.  (Tr. 4–6.) The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g).  (Docket No. 1.)   The parties' motions for summary judgment are pending.  (Docket Nos. 9, 10.)  Those motions will be analyzed in light of the applicable standard of review.

## II.  ANALYSIS

**A.      Standard of Review**

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that he is disabled.  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A).   A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)    whether the claimant is currently working in substantial gainful employment;

(2)    whether the claimant suffers from a severe impairment;

(3)    whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)    whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)    whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At steps one through four, the burden of proof rests upon the claimant to show that he is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at step five of the process to show that there is other gainful employment that the claimant is capable of performing despite his existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

In this case, the ALJ found at step four that, while Plaintiff was able to perform restricted light work, he was not capable of returning to his past relevant work. At step five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because he could perform jobs existing in significant numbers in the national economy. (Tr. 23.)

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Masterson*,

309 F.3d at 272.  Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion.  *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  Evidentiary conflicts are for the Commissioner to resolve, not the courts.  *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).  This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question.  *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.     Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff claims that the ALJ erred in two ways: 1) failing to find that chronic venous insufficiency of the right lower extremity constitutes a severe impairment; and 2) failing to explain his determination that the chronic venous insufficiency in Plaintiff's lower right leg does not meet or equal Listing 4.11A.  (Docket No. 9, at 2.)  These issues address step two and step three of the disability analysis.  The Commissioner contends that the denial of benefits should be affirmed because the ALJ properly determined that Plaintiff was not disabled within the meaning of the Act.  (Docket No. 11, at 9.)  In response to Plaintiff's claims, the Commissioner argues that the ALJ did not err at either step two or step

19

three.[16]  (*Id.* at 3-8.)  The issues raised by the parties will be addressed in the context of the standard of review that applies in social security cases (as discussed above).

## C.      Step Two Claim

Plaintiff asserts that the ALJ erred at step two in failing "to find that chronic venous insufficiency of the right lower extremity constitutes a severe impairment." (Docket No. 9, at 7.)  Plaintiff claims that "uncontroverted evidence" shows that his right leg venous insufficiency was a severe impairment.  (*Id.* at 8.)  The Commissioner contends that the ALJ did not error because he "properly contributed [Plaintiff's] complaints of bilateral leg pain, including chronic deep vein thrombosis in his right leg, to the injuries [Plaintiff] suffered to his right hip and right femur in 1991."  (Docket No. 11, at 3.)  In resolving this issue, we must first determine whether the ALJ property analyzed the severity of Plaintiff's impairments.

### 1.      ALJ's Step Two Severe Impairment Determination

For purposes of step two of the disability analysis, an impairment is severe if it is an abnormality that has more than a minimal effect on an individual's ability to work, irrespective of age, education, or work experience.  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985); *see also* 20 C.F.R. § 404.1521; SSR 96-3p, 1996 WL 374181 (July 2, 1996).  To meet this severity threshold, the claimant need only "make a de minimis showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992).  The ALJ's determination of

---

[16]    In addition, the Commissioner asserts that the ALJ properly relied on the vocational expert's testimony at the evidentiary hearing.  (*Id.* at 8-9.)  Because Plaintiff did not challenge the ALJ's finding at step five as a separate claim, this issue need not be addressed (other than as it relates to Plaintiff's challenge to the ALJ's determinations at step two and step three).

whether the claimant has met the severity standard must be affirmed so long as it is supported by substantial evidence.  *See id*. at 295-96 (holding that "the record furnishes minimally adequate support for the Secretary's finding that [claimant] did not establish a severe impairment").

Plaintiff contends that evidence shows that the ALJ erred in failing to find that his "chronic venous insufficiency of the right lower extremity constitutes a severe impairment."  In particular, Plaintiff notes the 2006 Doppler study showing that he has "chronic right leg femoral deep venous thrombosis with collateralization."[17]  (Docket No. 9, at 8; citing Tr. 264.)   Plaintiff also emphasizes Dr. Zain's statement that he is "significantly disabled."  (Docket No. 9, at 8-9.)   In addition, Plaintiff relies on the vocational expert's opinion that Plaintiff was unable to return to his past work, which was an opinion based on the state agency medical consultants' assessment of Plaintiff's limitations.  (*Id*. at 9.)  Plaintiff cites his own testimony that he has frequent "swelling of the legs" and "constant pain" in his right leg, which prevent him from working because

---

[17]  Although Plaintiff framed the step 2 issue in terms of "venous insufficiency," the medical evidence relating to the condition of Plaintiff's right leg refers to "venous thrombosis."  (*See, e.g*., Tr. 120, 262, 264.)  Plaintiff uses the terms interchangeably in his briefing and appears to assume that venous thrombosis is a type of venous insufficiency.  (*See, e.g*.,  Docket No. 9, at 2 ("venous insufficiency"), 4 ("venous thrombosis" and "venous insufficiency"), 5 ("venous thrombosis"), 7 ("venous thrombosis" and "venous insufficiency"). )  The difficulty with this assumption is that there is no medical evidence in the record to establish it (at least none that Plaintiff has cited or that the Court can locate).  Nevertheless, this assumption appears to be consistent with widely-accepted medical authorities.  *See, e.g*., Robert Weiss, MD, *Venous Insufficiency*, MEDSCAPE REFERENCE (May 26, 2011), http://emedicine.medscape.com/article/1085412-overview ("Deep venous insufficiency occurs when the valves of the deep veins are damaged as a result of deep venous thrombosis (DVT).").  The Court will assume that "venous thrombosis" is a type of "venous insufficiency."

he must elevate his leg and frequently alternate between sitting and standing.[18]   (*Id*.)
According to Plaintiff, this evidence compelled the conclusion that his right leg venous
thrombosis constituted a severe impairment.  (*Id*. at 9-10.)

The ALJ determined that Plaintiff had the following "severe" medical
impairments: degenerative joint disease of the right ankle, fracture deformity of the right
femur, congestive heart failure, diabetes mellitus, and obesity.  (Tr. 17.)  While the ALJ
thus found that Plaintiff had two severe impairments relating to his right leg, the ALJ did
not specifically address whether or not the chronic venous thrombosis in Plaintiff's right
leg constituted a separate severe impairment.  The issue is whether the ALJ erred in
failing to find that Plaintiff's chronic venous thrombosis was a separate severe
impairment within the meaning of step two of the disability analysis.

The Commissioner argues that the ALJ "properly attributes" Plaintiff's deep vein
thrombosis to the leg injuries he suffered in the 1991 motorcycle accident.  (Docket No.
11, at 3.)  To the extent that the ALJ considered Plaintiff's right leg venous thrombosis as
part of his other right leg impairments, such a conclusion would find support in the
findings of Dr. Cremona, one of the state agency medical consultants.  Dr. Cremona

---

[18]   Plaintiff states in his briefing that he was fired from his last job due to his need
to stand up and elevate his leg while at work.  (Docket No. 9, at 9.)  However, Plaintiff's
hearing testimony suggests some uncertainty about this conclusion.  When asked by his
attorney why he was fired, Plaintiff responded: "Well, what, what I'm thinking is that
because I'm standing too many times at my desk and they didn't allow me.  They kept
telling me to sit down."  (Tr. 337.)  Plaintiff stated that his employer did not allow him to
put his leg up on his computer or on a chair.  (*Id*.)  When counsel asked Plaintiff why
they would not allow him to elevate his leg, Plaintiff explained: "I don't know.  I never
asked."  (Tr. 338.)  It is unclear from Plaintiff's testimony whether he ever discussed his
medical condition with his employer.  In any event, the employer's specific reason for
terminating Plaintiff's employment is not directly relevant to whether Plaintiff is disabled
within the meaning of the Social Security Act.

considered Plaintiff's medical records in evaluating his residual functional capacity, specifically noting the finding of right leg "deep venous thrombosis." (Tr. 120.) Yet Dr. Cremona's assessment does not suggest that Plaintiff's right leg thrombosis, standing alone, is a severe impairment; Dr. Cremona did not list that condition as a separate impairment that limited Plaintiff's functional capacity. Nor is there any other medical source evidence that specifically attributes any functional limitations to Plaintiff's venous thrombosis. While Plaintiff cites Dr. Zain's statement that he is "significantly disabled" (Docket No. 9, at 8), Dr. Zain did not mention venous thrombosis or insufficiency; rather, she attributed Plaintiff's leg problems to his motorcycle accident, noting further that his "primary injury is significantly made worse by his obesity."[19] (Tr. 314.)

Given this record, it is questionable whether Plaintiff carried his step two burden of proof as it relates specifically to venous thrombosis.[20] In light of the absence of evidence specifically linking Plaintiff's venous thrombosis to functional limitations, the ALJ's apparent decision to treat venous thrombosis as part of Plaintiff's other leg problems was arguably not error.

However, because the ALJ failed to specifically address the severity of Plaintiff's right leg venous thrombosis, it is difficult to determine whether the ALJ in fact considered it as part of Plaintiff's other severe right leg impairments. "[A]t step two of the five step analysis, the adjudicator must determine whether any identified impairments

---

[19] Dr. Zain's failure to mention venous thrombosis is not surprising, since she examined Plaintiff before the Doppler testing that revealed deep venous thrombosis. (*Compare* Tr. 264 (Doppler study results dated January 19, 2006), *with* Tr. 313 (Dr. Zain's report dated December 1, 2005).)

[20] There can be no doubt that Plaintiff carried this burden as to right leg impairment generally, and the ALJ found that Plaintiff has two severe impairments relating to his right leg.

are 'severe' or 'not severe.'"  *Herrera v. Comm'r of Social Security*, 406 F. App'x 899, 903 (5th Cir. 2010) (citing 20 C.F.R. § 404.1520(a)(4)(ii)).   Here, Plaintiff's right leg deep venous thrombosis was identified in the medical records and discussed at the evidentiary hearing.   During the hearing, the ALJ observed that Plaintiff had "a documented diagnosis of deep venous thrombosis on the right leg," and Plaintiff's counsel argued that this condition satisfied the requirements for the step three listing for venous insufficiency.  (Tr. 341, 361.)  Particularly since Plaintiff's venous thrombosis was specifically discussed at the hearing, it is unclear why the ALJ did not address whether it was a severe impairment.

2.     Harmless Error Analysis

Assuming (without deciding) that the ALJ erred in failing to specifically address whether Plaintiff's right leg venous thrombosis was a severe impairment, the next question is whether the ALJ committed reversible error.   "Procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

In the context of an error at step two of the disability analysis, the Fifth Circuit has consistently held that an "ALJ's failure to assess the severity of [a claimant's] impairments at step two is not a basis for remand" where the ALJ proceeds beyond step two and determines that a claimant, despite severe impairments, "retained the residual functional capacity to do other work."  *Herrera*, 406 F. App'x at 903; *see also Reyes v. Sullivan*, 915 F.2d 151, 154 (5th Cir. 1990) ("Because the ALJ proceeded to the third step in evaluating [claimant's] claim, we must infer that the ALJ found a severe impairment.");  *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (holding that there is

24

"no ground to remand" where the "case did not depend upon a conclusion of the 'non-severity' of [claimant's] condition"); *Mays*, 837 F.2d at 1364 ("[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found.").

Applying this harmless error standard, the ALJ's step two determination must be affirmed.  The ALJ determined that Plaintiff was disabled at step five of the disability analysis, based on the finding that, despite limitations that prevented Plaintiff from performing his past work, he retained the functional ability to perform jobs existing in significant numbers in the national economy.  (Tr. 22-23.)  Because the ALJ proceeded past step two of the disability analysis, it should be presumed that he found Plaintiff's medical conditions to be severe, including his right leg venous thrombosis.  *Reyes*, 915 F.2d at 154.

This is particularly appropriate here because the ALJ considered all of Plaintiff's symptoms related to venous thrombosis in determining whether Plaintiff was disabled at steps four and five of the analysis.  The principal symptoms that Plaintiff attributes to venous thrombosis are pain and swelling in his legs.  (*See* Docket No. 9, at 9.)  The ALJ considered these symptoms in connection with his disability analysis at steps four and five.  (*See* Tr. 20-22.)  Specifically, the ALJ noted in his decision that Plaintiff was found to have "+2 edema and chronic skin changes secondary to chronic edema."  (Tr. 18.)  The ALJ cited the Doppler study showing "evidence of chronic deep vein thrombosis."  (*Id.*)  He also considered Plaintiff's subjective symptoms and testimony about his condition, including complaints of "chronic swelling" requiring him to "alternate between sitting and standing and . . . elevate his legs to relieve swelling."  (Tr. 21.)  The ALJ took these

symptoms into account in determining whether Plaintiff was able to return to his prior work (step four) and whether he was capable of performing other available jobs (step five).[21]  (Tr. 20-23.)

Because the ALJ decided Plaintiff's disability claim at step 5—and considered all of Plaintiff's symptoms in doing so—any error by the ALJ at step two was harmless.

3.    Substantial Evidence

Plaintiff has not specifically challenged the ALJ's findings at step four and five of the disability analysis.  In any event, even if Plaintiff's step two claim is construed to challenge the ALJ's determinations at step four and five, the evidence in the record

---

[21]    Plaintiff claims that he was prejudiced by the ALJ's failure to recognize venous thrombosis as a severe impairment at step two.  Plaintiff relies on the testimony of the vocational expert.  (Docket No. 9, at 10.)  Plaintiff argues that the VE took into account the limitations recognized by the state agency medical consultant and opined that a person with those limitations could not perform the full range of sedentary work.  (*Id.*)  While this is an accurate description of part of the VE's testimony, it does not support the conclusion that the ALJ committed reversible error for two reasons.  First, the vocational expert is not a medical expert, and his testimony has little (or no) relevance on the issue of whether Plaintiff's venous thrombosis resulted in functional limitations that met the step two severe impairment standard.   Second, the VE did not say anything about Plaintiff's venous thrombosis or the effect that particular impairment had on his ability to perform available jobs.  The VE's testimony was directed to the ALJ's hypotheticals describing various functional limitations, without regard to the medical cause(s) of those limitations.  Whether or not the ALJ had specifically found venous thrombosis to be a severe impairment had no bearing on the VE's testimony.  To the extent that Plaintiff's prejudice argument could be read as a claim that the ALJ erred at step five in light of the VE's testimony, that argument would also lack merit.  In response to one of the ALJ's hypothetical questions, the VE opined that "[t]here would be jobs that could be done with that profile in the light range that allow sit/stand options."  (Tr. 358.)  The VE identified three different jobs existing in substantial numbers that Plaintiff could perform with those functional limitations.  (*Id.*)  The ALJ did not err in relying on this testimony from the VE.  *See Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) ("A vocational expert is called to testify because of his familiarity with job requirements and working conditions.").

reflects that the ALJ's ultimate finding is supported by substantial evidence, including the following:

- Dr. Zain observed that Plaintiff's gait was "normal," he was "able to get up from the chair to the examination couch with only slight difficulty," and he was able to "move around."  (Tr. 314.)

- Dr. Zain noted that Plaintiff was able to complete "[s]traight leg raising," he had "good range of motion" in his knees, and his lower extremity power was "4/5."[22]  (*Id.*)

- The Doppler study showing deep venous thrombosis in Plaintiff's right leg also showed that there was "no evidence of deep venous thrombosis" in his left leg.  (Tr. 264.)

- Dr. Sy noted that Plaintiff's deep venous thrombosis was "maintained only on aspirin."  (Tr. 180.)

- Dr. Cremona found, based on the medical evidence, that Plaintiff was capable of performing light work and that his alleged limitations were not supported by the evidence.[23]  (Tr. 116-20.)

- Plaintiff's activities include mowing the lawn using a "weed eater" and going hunting and fishing with his friends.  (Tr. 353.)

---

[22]  Plaintiff emphasizes Dr. Zain's statement that he was "significantly disabled." (Tr. 314.)  It should be noted, however, that while Dr. Zain's medical opinions must be considered, the ultimate issue of disability status "is reserved to the ALJ."  *Claiborne v. Astrue*, 255 F. App'x 854, 857 (5th Cir. 2007) (citing 29 C.F.R. §§ 404.1527(e), 416.927(e)(1)); *see also Newton v. Apfel*, 209 F.3d 448, 455-56 (5th Cir. 2000) ("the ALJ has sole responsibility for determining a claimant's disability status," "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," and the opinions of treating physicians "may be assigned little or no weight" when the opinion is conclusory, unsupported by medically acceptable evidence, or is otherwise lacking substantial support).  Dr. Zain also observed that Plaintiff "would be [a] lot more functional" if he weighed less.  (Tr. 314.)

[23]  Dr. Cremona is one of the state agency medical consultants.  Such state agency consultants "are highly qualified physicians . . . who are also experts in Social Security disability evaluation."  20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).  In light of that expertise, the ALJ was required to consider their findings "as opinion evidence," except on the ultimate issue of disability.  *Id.*

In addition to this evidence, the ALJ properly evaluated Plaintiff's subjective symptoms using the two-step approach described in the regulations (Tr. 20-22).  *See* 20 C.F.R. § 404.1529(b), (c); *see also Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce some degree of symptomatology; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."[24]  (Tr. 21-22.)  An ALJ's determination whether subjective complaints, such as pain, are disabling is "entitled to considerable deference."  *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991).  The ALJ's credibility determination, together with medical evidence in the record, provides substantial evidence to support his ultimate decision at step five that Plaintiff is not disabled.

In sum, while the ALJ arguably erred in failing to address whether Plaintiff's chronic deep vein thrombosis is a severe impairment, any such error was harmless since the ALJ did not end his disability analysis at step two but instead found Plaintiff to be not disabled at step five.

## D.    Step Three Claim

Plaintiff asserts that the ALJ erred at step three in "fail[ing] to explain his determination that the plaintiff's chronic venous insufficiency of a lower extremity and other impairments do not meet or equal Listing 4.11A to establish disability on medical factors alone."  (Docket No. 9, at 11.)  The Commissioner contends that the ALJ did not commit reversible legal error for several reasons, including that the ALJ implicitly found

---

[24] It should be noted that the ALJ did not suggest that Plaintiff is pain-free or that he is capable of the full range of work activities.  To the contrary, the ALJ found that Plaintiff's impairments limited him to restricted light work.  (Tr. 22.)

that Plaintiff did not meet the listing and that the medical evidence does not support a finding that Plaintiff satisfied the requirements for Listing 4.11A.  (Docket No. 11, at 5-8.)

At step three of the disability analysis, "the medical evidence of the claimant's impairment(s) is compared to a list of impairments presumed severe enough to preclude any gainful activity."  *Loza v. Apfel*, 219 F.3d 378, 390 (5th Cir. 2000).  "If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (citing 20 C.F.R. § 404.1520(e)).  "Impairments found in the Listings are those that the Commissioner acknowledges are so severe that they automatically preclude substantial gainful activity." *Henson v. Barnhart*, 373 F. Supp. 2d 674, 684 (E.D. Tex. 2005) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).  An ALJ is required to state sufficient reasons for an adverse determination at step 3.  *See Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (holding that "the ALJ erred in failing to state any reason for her adverse determination at step 3").

Here, the ALJ found that Plaintiff did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments."  (Tr. 19.)  In making this finding, the ALJ discussed several Listings relevant to Plaintiff's impairments, including Listings 3.02 (pulmonary insufficiency), 1.02A (major dysfunction of a joint), and 9.08 (diabetes mellitus).  (Tr. 19-20.)  Unfortunately, the ALJ did not specifically discuss (or even mention) Listing 4.11A, which addresses chronic venous insufficiency.  20 C.F.R. Part 404, Subpart P, App. 1, § 4.11A.  Once again, it is unclear why the ALJ did not do so since this is the Listing that Plaintiff's counsel emphasized at the hearing.  (Tr. 361.)  The ALJ's failure to say anything about Listing

4.11A makes it difficult for the Court to review his implicit decision that Plaintiff did not meet the criteria for this Listing.  *Audler*, 501 F.3d at 448 (holding that the "ALJ erred in failing to state any reason for her adverse determination at step 3").[25]

Assuming that the ALJ erred at step 3 in failing to mention Listing 4.11A, "we must still determine whether this error was harmless."  *Id.* (citing *Morris v. Bowen*, 864 F.2d 333, 334 (5th Cir. 1988)).   In considering whether a step 3 error was harmless in *Audler*, the Fifth Circuit reviewed the evidence to determine if the claimant had demonstrated that she satisfied all the criteria of the Listing at issue.  *Id.* at 448-49.  The record included findings from claimant's treating physician that satisfied the Listing, and "[n]o medical evidence was introduced to contradict these findings."  *Id.* at 449.  The Fifth Circuit concluded that, in the absence of some explanation from the ALJ, the claimant "met her burden of demonstrating that she meets the Listing," and thus "her substantial rights were affected by the ALJ's failure to set out the bases for her decision at step three."  *Id.*

Applying this analysis here, Plaintiff must establish that his impairment "meet[s] *all* of the specified medical criteria" of Listing 4.11A.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) ("[T]o secure a finding of disability without consideration of age, education, and work experience, a claimant must establish that his impairment meets or equals an impairment enumerated in the listing of impairments in the appendix to the regulations.").   The

---

[25]   In fairness to the ALJ, this is not a case, like *Audler*, where the ALJ failed to provide any analysis at step three.  As noted above, the ALJ discussed several different Listings that are relevant to Plaintiff's disability claim.

criteria in the Listings are "demanding and stringent." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

Listing 4.11A has two criteria that must be met: (1) "[c]hronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep venous system"; and (2) "[e]xtensive brawny edema involving at least two-thirds of the leg between the ankle and knee or the distal one-third of the lower extremity between the ankle and hip." 20 C.F.R. Part 404, Subpart P, App. 1, § 4.11A. Plaintiff must meet his "burden of demonstrating that [he] meets the Listing requirements." *Audler*, 501 F.3d at 449.

　　1.　Chronic Venous Insufficiency

The medical evidence in the record appears to support the conclusion that Plaintiff meets the first criteria of Listing 4.11A. After Plaintiff was admitted to the hospital in January 2006 complaining of shortness of breath, a Doppler examination revealed lower right leg "chronic deep venous thrombosis." (Tr. 264.) Based on this testing, Dr. Gonzalez and Dr. Sy both noted in their hospital reports that Plaintiff had "deep venous thrombosis" in his right leg. (Tr. 176-77, 180-81.) Dr. Gonzalez explained that a "thrombus [blood clot] is already fixed to the vessel wall." (Tr. 179.) When Plaintiff was discharged from the hospital, Dr. Gonzalez stated that Plaintiff's right leg deep venous thrombosis was "chronic, stable." (Tr. 177.)

Based on these medical records showing that Plaintiff has "deep venous thrombosis" in his lower right leg, he arguably has met his burden to establish "[c]hronic venous insufficiency of a lower extremity with incompetency or obstruction of the deep

venous system."[26]  20 C.F.R. Part 404, Subpart P, App. 1, § 4.11A.  Having met the first

criteria of the Listing, Plaintiff must also establish that he satisfies the second criteria.

      2.    <u>Brawny Edema</u>

      The second criteria for Listing 4.11A requires "[e]xtensive brawny edema

involving at least two-thirds of the leg between the ankle and knee or the distal one-third

of the lower extremity between the ankle and hip."  20 C.F.R. Part 404, Subpart P, App.

1, § 4.11A.  Plaintiff thus must show both that he has "brawny edema" and that it is

sufficiently "extensive."

      "Brawny edema" is defined as "swelling that is usually dense and feels firm due

to the presence of increased connective tissue; it is also associated with characteristic skin

pigmentation changes."  *Id.* at § 4.00G3.  While there is evidence showing that Plaintiff

has edema (swelling) in his leg with skin discoloration, the record does not establish that

he has "brawny edema."

      Dr. Zain noted that Plaintiff's legs revealed "2+ edema and chronic skin changes

secondary to chronic edema," with "brownish pigmentation of chronic edema in both

lower legs."  (Tr. 314.)  When Plaintiff was admitted to the hospital in January 2006, it

was noted that he had "lower extremity edema."  (Tr. 183.)  Dr. Gonzalez observed that

Plaintiff had "pretibial edema 2+" in both legs, with dark skin discoloration distally in

both legs.  (Tr. 178.)  As noted, Doppler testing showed that Plaintiff had "right lower

extremity with evidence of chronic deep venous thrombosis with collateralization."  (Tr.

190.)  But no medical source described Plaintiff's condition as "brawny endema," nor do

---

[26]  Here again, the Court will assume that chronic venous thrombosis is a type of chronic venous insufficiency.  *See supra* n.17.

the medical records describe the symptoms of brawny endema as defined in the regulations.

In addition to the lack of medical evidence to support a finding of brawny edema, Plaintiff's own testimony about his symptoms suggests that he has "pitting edema," rather than "brawny edema."  The two are not the same.  "Brawny edema generally does not pit (indent on pressure), and the terms are not interchangeable.  Pitting edema does not satisfy the requirements of 4.11A."  20 C.F.R. Part 404, Subpart P, App. 1, § 4.00G3. When describing his leg at the evidentiary hearing, Plaintiff said that "[w]hen you press on it or anything like that . . . your finger [ ] doesn't come back up."  (Tr. 340.) Plaintiff's description is more consistent with pitting edema than brawny edema.

In addition to the absence of evidence establishing that Plaintiff has brawny edema at all, the record does not show whether any brawny edema is sufficiently extensive ("involving at least two-thirds of the leg between the ankle and knee").[27]  20 C.F.R. Part 404, Subpart P, App. 1, § 4.11A.  Because Plaintiff has failed to establish "*all* of the specified medical criteria" of Listing 4.11A, he does not qualify as disabled under that Listing.  *Zebley*, 493 U.S. at 530 (emphasis in original); *Muse*, 925 F.2d at 789 ("[T]o secure a finding of disability without consideration of age, education, and work experience, a claimant must establish that his impairment meets or equals an impairment enumerated in the listing of impairments in the appendix to the regulations.").

---

[27] Plaintiff candidly acknowledges this fact, stating that "[t]he record may be insufficient, however, to determine whether plaintiff has 2+ brawny edema or pitting edema and whether his pretibial edema involves at least two-thirds of the leg between the ankle and knee as required by the listing."  (Docket No. 9, at 14 n.6.)

In sum, although the ALJ may have erred in failing to discuss Listing 4.11A at step 3 of the disability analysis, that error was harmless.  The ALJ did not commit reversible error because Plaintiff has failed to establish that he meets all of the criteria in order to be found presumptively disabled under Listing 4.11A.

### III.  CONCLUSION

Based on the foregoing, Plaintiff's claim that the ALJ committed reversible error lacks merit.  Plaintiff's motion for summary judgment (Docket No. 9) is DENIED, and the Commissioner's motion for summary judgment (Docket No. 10) is GRANTED.  A judgment consistent with this memorandum opinion will be entered.

The Clerk shall provide a copy of this memorandum opinion to counsel for the parties.

DONE at McAllen, Texas on January 3, 2012.

_____
Peter E. Ormsby
United States Magistrate Judge

34